UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                  :

EDGAR ENCARNACION-LAFONTAINE,    :
                                  :

          petitioner,    :

                                  :

        - v. -          :    20 Civ. 1170 (JSR) (SLC)
                                  :    13 Cr. 30 (JSR)

UNITED STATES OF AMERICA,    :

                                  :

          Respondent.    :

                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO PETITIONER'S
MOTION UNDER 28 U.S.C. § 2255 TO VACATE,
SET ASIDE, OR CORRECT SENTENCE**

AUDREY STRAUSS
Acting United States Attorney for
the Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Emil J. Bove III
Assistant United States Attorney
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 2

BACKGROUND .................................................................................................................... 2

   I. The Indictments ........................................................................................................... 3

   II. The Trial Evidence .................................................................................................... 4

      A. The Marijuana Conspiracy ..................................................................................... 4

      B. The Cocaine Conspiracy ......................................................................................... 8

      C. Encarnacion's Extortionate Threats and Witness Tampering ........................................... 9

         1. The December 2010 Theft and Threats ................................................................. 9

         2. Encarnacion's Threats Via Facebook ................................................................. 11

         3. Encarnacion's Threats to Goris's Mother ............................................................ 12

         4. Goris's Consensually Recorded Calls to Encarnacion and Juan Peralta ..................... 14

      D. Encarnacion's Trial Testimony ............................................................................. 15

   III. The Verdict, Post-Trial Motions, and Sentencing ............................................................. 15

   IV. Direct Appeal ......................................................................................................... 17

   V. Encarnacion's 2019 Application Pursuant to the First Step Act............................................. 17

LEGAL STANDARDS ......................................................................................................... 17

DISCUSSION ..................................................................................................................... 18

   I. The Petition Is Untimely ............................................................................................. 18

      A. Applicable Law ................................................................................................. 18

      B. Discussion ....................................................................................................... 19

   II. The Petition Is Meritless ............................................................................................ 22

      A. Applicable Law ................................................................................................. 22

      B. Discussion ....................................................................................................... 24

   III. No Certificate of Appealability Should Be Issued............................................................. 27

CONCLUSION.................................................................................................................... 29

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the petition filed by Edgar Encarnacion-Lafontaine ("Encarnacion"), pursuant to Title 28, United States Code, Section 2255, to correct, vacate, or set aside his conviction and sentence. For the reasons set forth below, the Court should deny the petition because it is untimely and meritless, and no certificate of appealability should issue.

## BACKGROUND

The Government established at trial that Encarnacion—a truck driver for a FedEx contractor—agreed to use his position to provide transportation services to two separate drug-trafficking organizations. With respect to the first of these organizations, Encarnacion agreed to use his truck to drive marijuana from California to New York. Despite their best efforts, however, Encarnacion and the head of that organization never successfully found an opportunity for Encarnacion to do so. With respect to the second organization, Encarnacion was more successful, driving cocaine from California to the East Coast on at least three separate occasions.

In December 2010, agents from the Department of Homeland Security, Homeland Security Investigations ("HSI"), arrested Encarnacion, and he confessed to participating in a conspiracy to distribute cocaine. Subsequently, while on pretrial release, Encarnacion and an associate named Juan Peralta made a series of illegal threats to Rafael Goris, one of Encarnacion's former coworkers, seeking (i) to extort the return of cocaine proceeds that Goris had stolen, and (ii) to prevent Goris from reporting Encarnacion's illegal activities to law enforcement.

## I. The Indictments

The Government initially charged Encarnacion with participating in a marijuana-trafficking conspiracy, first in a criminal Complaint docketed 10 Mag. 2253, and subsequently in an Indictment filed in this District under docket 10 Cr. 905.  On January 6, 2014, following Encarnacion's December 2010 arrest, release on bail, and commission of additional crimes while the marijuana-trafficking charge was pending, the Government charged Encarnacion in Superseding Indictment S2 13 Cr. 30 (JSR) (the "Indictment") with:

- Count One:  conspiracy to distribute 1,000 kilograms and more of marijuana, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846;

- Count Two:  conspiracy to distribute five kilograms and more of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846;

- Count Three:  conspiracy to commit extortion and to use interstate facilities to facilitate unlawful activities, in violation of Title 18, United States Code, Sections 371, 875(b), and 1952(a)(3);

- Count Four:  extortion, in violation of Title 18, United States Code, Section 875(b);

- Count Five:  using interstate facilities to facilitate unlawful activities, in violation of Title 18, United States Code, Section 1952(a)(3); and

- Count Six:  conspiracy to commit witness tampering, in violation of Title 18, United States Code, Sections 1512(a)(2) and 1512(k).

Prior to trial in December 2014, Encarnacion pleaded guilty, participated in a *Fatico* hearing, and then withdrew his guilty plea on the day that he was to be sentenced. *See United States v. Encarnacion*, No. 13 Cr. 30 (JSR), 2014 WL 3500557 (S.D.N.Y. July 9, 2014) (issuing post-*Fatico* findings); *see also United States v. Encarnacion*, No. 13 Cr. 30 (JSR), 2014 WL

6769117 (S.D.N.Y. Nov. 17, 2014) (denying Government's motion for reconsideration of decision permitting Encarnacion to withdraw his guilty plea). Encarnacion does not challenge these aspects of the proceedings in the petition.

## II.  The Trial Evidence

Encarnacion proceeded to trial on the six charges in the Indictment in December 2014. Prior to the jury's deliberations, the Government elected not to proceed on Count Five. The jury subsequently convicted Encarnacion on the five remaining charges.

### A.  The Marijuana Conspiracy

Between approximately 2005 and December 2010, Encarnacion worked as a truck driver for a FedEx contractor based in Woodbridge, New Jersey. (Tr. 806-07).[1] In 2005, Encarnacion approached Edwin Herrera—then a member of an interstate marijuana-trafficking organization (the "Marijuana Organization"), and eventually a cooperating witness at Encarnacion's trial (Tr. 102-03, 110-14)—and offered to use his FedEx truck to transport the Organization's marijuana from Florida to New York City. (Tr. 117). Encarnacion also offered to transport cocaine, explaining to Herrera that he believed that would be "more lucrative," "easier to package, easier to carry, [and] easier to hide in the trucks." (Tr. 117). Herrera declined Encarnacion's offers at that time because, among other reasons, Encarnacion's FedEx route only took him to Fort Myers, Florida, and the Organization's drugs needed to be collected from Miami. (Tr. 117-18).

---

[1] "Tr." refers to the trial transcript; "GX" refers to a Government exhibit admitted at trial; and "A" refers to the appendix to Encarnacion's brief filed in the Second Circuit case with docket 15-1223. "Dkt. No." refers to docket entries in 13 Cr. 30, and page citations to those entries are to the ECF page number.

Although Encarnacion's services had not been needed in 2005, the leader of the Marijuana Organization—Manuel Geovanny Rodriguez-Perez ("Rodriguez")[2]—reached out to Encarnacion in 2010 to arrange for Encarnacion to transport marijuana from California to New York. In order to make contact with Encarnacion, Rodriguez had Isidro Herrera—another member of the Marijuana Organization, Edwin Herrera's brother, and an additional cooperating witness at Encarnacion's trial (Tr. 325-27)—obtain Encarnacion's telephone number from Encarnacion. (Tr. 330-31). Encarnacion gave Isidro Herrera his number to be passed along to Rodriguez, and told Isidro Herrera to tell Rodriguez that "his routes ha[d] changed." (Tr. 331).

Encarnacion agreed with Rodriguez to transport the organization's marijuana from California to New York, as reflected in a series of telephone calls to and from Rodriguez's phone that the Government intercepted pursuant to Title III and offered at trial.  First, on June 17, 2010, Isidro told Rodriguez about his conversation with Encarnacion and passed along Encarnacion's telephone number. (A. 1025-27). On the same day, Rodriguez called Encarnacion to set up an in-person meeting in upper Manhattan, and subsequent calls showed that the two met on June 18 and June 20, 2010. (A. 1028-37). As Encarnacion admitted in his own testimony at trial, Rodriguez told Encarnacion during these meetings that he wanted Encarnacion "to transport marijuana." (Tr. 876, 881; *see also* Tr. 50-51 (post-arrest admission by Encarnacion that Rodriguez was a

---

[2] Rodriguez's Marijuana Organization was massive in scope and brutally violent. In the case docketed 10 Cr. 905, Rodriguez pleaded guilty to one count of racketeering conspiracy, and accepted responsibility for dozens of illegal acts associated with the Marijuana Organization, including nine murders and 10 attempted murders in the United States and the Dominican Republic. In March 2017, Judge Swain sentenced Rodriguez to life imprisonment and ordered forfeiture in the amount of $25 million.

marijuana dealer with whom he had discussions about transporting marijuana from San Francisco to New York)).

The Government offered subsequent intercepted calls to prove that Encarnacion agreed to Rodriguez's request. On June 21, 2010, Encarnacion informed Rodriguez that he would soon be dispatched by FedEx and that he would try to arrange to be sent to the West Coast, calling it "the desert." (A. 1041). Encarnacion told Rodriguez that "if it can't be done this week, . . . don't worry 'cause now it's only forward that we're moving, only forward that we're moving." (A. 1042). The next day, Encarnacion predicted to Rodriguez that he would be "leaving tomorrow" to "go[ ] to where we talked about," calling it the "Cubans' place." (A. 1046).

On June 24, 2010, Encarnacion confirmed for Rodriguez that he was "definitely going to the West Coast" and that he would be there by Saturday, June 26, 2010. (A. 1058). During the same call, Rodriguez told Encarnacion, "[w]e're serious, brother," "[c]ome over here . . . I'm gonna wait for you," and Encarnacion responded that he was "[g]oing over there like a blast." (A. 1058). Later on June 24, Encarnacion confirmed his plan to meet Rodriguez and his "guys" at a specific location in the Los Angeles area on June 26, 2010. (A. 1061-63).

Also on June 24, 2010, while Encarnacion was finalizing his plans to meet Rodriguez two days later, Edwin Herrera arrived in Santa Monica, California to meet up with Rodriguez. (Tr. 174; A. 1064-74). Once there, Edwin Herrera joined Rodriguez and two other members of the Marijuana Organization in a hotel room, where another drug trafficker showed the group samples of marijuana and discussed pricing and transportation. (Tr. 182-84). During that meeting, Rodriguez told Edwin Herrera that Encarnacion had been lined up to transport the marijuana to

the East Coast, and explained to Herrera that Encarnacion was at that moment conducting a "dry run" by transporting $60,000 in cash to California to pay for the drugs, with the intention of transporting back any marijuana that the group purchased. (Tr. 184-85).

As it turned out, issues along Encarnacion's route prevented him from reaching California as planned. (*See* A. 1088-95). But in the ensuing weeks, Encarnacion and Rodriguez continued to meet (Tr. 750-51 (describing surveilled meeting)) and speak by phone (*see, e.g.*, A. 1109-14). In a call on July 8, 2010, Rodriguez expressed frustration that Encarnacion was proving unreliable, and that his failure to make it to California had forced Rodriguez to "leave something abandoned over there"—meaning the planned shipment of marijuana—but that it was "now on its way" to New York City by other means. (A. 1110-11). Encarnacion explained that he did not have complete control over his schedule because he "work[ed] for a company" that controlled his movements, but promised that "it's not gonna fall through from this point on." (A. 1110-11). Encarnacion told Rodriguez that he was starting another trip on Tuesday, and a skeptical Rodriguez directed Encarnacion to call him "on Tuesday if you're really in for it." (A. 1113). That Tuesday, as promised, Encarnacion called Rodriguez and told him: "[A]nything that can be done. I'm available for anything, you know, because . . . we're in movement." (A. 1116). The evidence at trial did not make clear what resulted from that trip, or from another series of calls between Encarnacion and Rodriguez (who was by then using a new phone) in August 2010 (*see* A. 1119-24).

B. **The Cocaine Conspiracy**

During roughly the same period in 2010 that Encarnacion was attempting to transport marijuana for Rodriguez, he was successfully using his FedEx truck to transport cocaine from California to New York and New Jersey for another organization. As explained to the jury by Rafael Goris—Encarnacion's driving partner, who testified at trial pursuant to a non-prosecution agreement (Tr. 436, 538; GX 800)—there were three separate occasions in 2010 when Encarnacion met with individuals in parking lots to receive packages that Encarnacion loaded into their truck. (Tr. 448-56). During one of these trips, Goris inspected a bag that had been supplied to Encarnacion in this manner and discovered that it contained six packages that were wrapped in "grayish tape," each approximately eight inches long, four inches wide, and two inches thick. (Tr. 456). Suspecting what was happening, Goris confronted Encarnacion about why he was "carrying cocaine in the truck." (Tr. 457). Encarnacion responded by telling Goris to "take it easy," and that he was "just doing that that one time" as a "favor for a friend." (Tr. 457). Encarnacion offered Goris $3,000 if he would "say nothing to [their boss] or FedEx or the police." (Tr. 457). Goris declined the offer, telling Encarnacion "not to do anything like that ever again." (Tr. 457).

Several months later, after Encarnacion made another suspicious pickup of boxes in a parking lot, Goris looked inside the boxes and, this time, found approximately 70 packages of "the exact shape and color" as the ones about which he had confronted Encarnacion previously. (Tr. 464). Goris asked Encarnacion "why he was . . . carrying all that cocaine," and Encarnacion responding by telling Goris to "c[alm] down," that "there was a lot of money to be made," and that Goris would be able to "take care of [his] family" with the money. (Tr. 465). Encarnacion offered

Goris $35,000 "to just continue . . . with the load without saying anything," and Goris accepted, but Encarnacion never paid. (Tr. 465).

Goris's description of Encarnacion's cocaine trafficking was confirmed by Encarnacion's own post-arrest confession. On December 21, 2010, HSI agents arrested Encarnacion at JFK airport. (Tr. 35). As explained by Special Agent Jason Samuels, Encarnacion thereafter gave an hour-long post-arrest statement in which, among other things, he admitted that: (i) beginning "months ago" and continuing until "as recently as two weeks" before his arrest, Encarnacion "had transported cocaine from California to New Jersey" in his FedEx truck, including a shipment that he believed to have been "20 kilograms of cocaine in a box"; and (ii) Encarnacion was at JFK airport on the day of his arrest because he was planning to travel to the Dominican Republic, where he expected "to be paid a thousand dollars per kilogram for the cocaine that he transported." (Tr. 53).

### C.  Encarnacion's Extortionate Threats and Witness Tampering

Both before and after his December 2010 arrest, Encarnacion issued repeated threats to Goris and Goris's family. Encarnacion's threats were primarily aimed at getting Goris to return $30,000 in cash that Goris had stolen. In addition, Encarnacion intended the threats to discourage Goris from communicating with law enforcement.

### 1.  The December 2010 Theft and Threats

Approximately one week before Encarnacion's December 21, 2010 arrest at JFK airport, as Encarnacion and Goris were beginning a trip to Columbus, Ohio, Goris watched a man give Encarnacion a duffel bag, which Encarnacion put in the sleeper of the truck. (Tr. 469-70). Goris

subsequently opened the bag and found "packages of cash" packed in "shrink wrap." (Tr. 470). Goris asked Encarnacion why he was transporting cash, and Encarnacion responded that it was "part . . . of the three boxes with the cocaine" and that "nobody gets in trouble for carrying money." (Tr. 471).

When they returned to Woodbridge, New Jersey, while Encarnacion was in the dispatch office, Goris stole approximately $30,000 in cash from the bag and fled the facility. (Tr. 474-76). After leaving the facility, Goris called his boss and quit his job. (Tr. 476-77). That night, Encarnacion placed a barrage of telephone calls to Goris. (Tr. 480; GX 1602). Goris did not answer the calls, but Encarnacion left a series of threatening voicemails in which Encarnacion stated that he "was not alone," and that he was going to make Goris or Goris's family "pay" if Goris did not "come up" with the money. (Tr. 480).

Several nights later, Encarnacion used his personal Facebook account to send messages to two individuals with the last name "Goris," as well as to a friend of Goris's. (A. 890, 907). Encarnacion asked the recipient of each message to call the telephone number of Encarnacion's girlfriend, "Nicole." (A. 907; *see also* Tr. 508 (Goris testimony that Encarnacion told Goris that Encarnacion had a girlfriend named Nicole); GX 700-A). When Goris's friend called the number, a man who described himself as Goris's "co-worker" (*i.e.*, Encarnacion) told her that Goris had "got in trouble" and "disappeared," and asked the friend if she had another telephone number for Goris or knew of his whereabouts. (Tr. 598-99).

### 2.  Encarnacion's Threats Via Facebook

Following his December 21, 2010 arrest, Encarnacion was released on bail. (GX 506 (factual stipulation)). Nearly a year later, while still on bail, Encarnacion reinitiated a multi-faceted campaign of threats, seeking to obtain return of the money that Goris had stolen, and to discourage Goris from contacting law enforcement.

On January 16, 2012, Encarnacion opened a Facebook account using the name of Goris's grandmother, Maria Marmol (the "Marmol Account"). (Tr. 508, 972; GX 210). On May 30, 2012, Encarnacion opened another account in the name of Rosa Mendez (the "Mendez Account"). (GX 211). Encarnacion's control of these accounts was established by the facts that they were accessed from internet cafes within blocks of his apartment, the contents of the messages betrayed that Encarnacion authored them, and each account was used to send a message to someone traceable to Encarnacion (namely, one of Encarnacion's ex-wife's in-laws).

On January 26 and February 6, 2012, Encarnacion used the Marmol Account to send threatening messages to the sister of Goris's wife (the "Sister-in-Law"). Among the messages, Encarnacion told the Sister-in-Law to "call" Goris's wife and "advise her for the sake of the entire family" that Goris should "return what he stole just a year ago." (A. 879). Encarnacion said that "we have already located all the necessary relatives here in the dominican republic" and that, unless Goris paid back the money, "some people" would "go to Ricon de Piedra and pay unwanted visits" to them. (A. 879). Encarnacion promised that if Goris did not "give back what he stole ugly things will happen," and, similarly, that if the Sister-in-Law did not communicate the message "RIGHT AWAY" she would "receive bad news and we should avoid that." (A. 879).

On July 5 and July 20, 2012, Encarnacion used the Mendez Account to send additional threats to the Sister-in-Law, telling her that her relatives were "in great danger," but that if Goris "g[ot] in touch" then "nothing will happen." (A. 884). Encarnacion threatened that the Sister-in-Law, her relatives, and Goris's relatives were all "gonna pay the consequences if that thief doesn't answer right away." (A. 880).

On July 29, 2012, Encarnacion used the Marmol Account to send a message to the brother of Goris's wife, saying that he wanted a response in order to "avoid tragedies," and threatening that because the message was being sent on behalf of a "a MEXICAN organization made up of Dominicans too," there were "no borders to [their] actions," and "none of you will be able to walk out on the street in peace" due to the actions of "that TRAITOR, RAFAEL GORIS." (A. 876-77). Encarnacion also expressly threatened that nobody should contact law enforcement, saying, "If any authority interferes it will be worst for the families in D[ominican] R[epublic]." (A. 877).

At some point in 2012, Encarnacion also used the Marmol Account to establish contact with a cousin of Goris's wife, who lived in the Dominican Republic. (GX 210). In approximately May 2012, that woman received a telephone call during which a man "demand[ed]" that she call Goris and "tell him to give back the money because if not, there were going to be a lot of problems and blood was going to be spilled." (Tr. 629, 633).

### 3.   Encarnacion's Threats to Goris's Mother

After Goris's family did not respond to Encarnacion's Facebook threats, Encarnacion went to Brooklyn to threaten Goris's mother at her apartment. On September 24, 2012, Encarnacion traveled to the vicinity of the apartment in an effort to identify the location. (GXs 1509, 1603

(historical cell site data)). The next day, Encarnacion and another man returned to the apartment to confront Mrs. Goris. (Tr. 766; *see also* GXs 1509, 1603). They began by yelling "Goris, Goris, Goris" outside her apartment. (Tr. 676-77). When Mrs. Goris opened the door, Encarnacion identified himself and yelled, "[I]t's all because of your son, your son that I lost my job." (Tr. 677; *see also* Tr. 865 (Encarnacion's testimony that he "[a]dvise[d]" Mrs. Goris to have Goris "return these people their money" and told her that he was "going through hell because of this situation")). The man who accompanied Encarnacion showed Mrs. Goris a photograph of Goris and Goris's children. (Tr. 677-78). Fearing for her son's safety, Mrs. Goris denied that she knew him. (*Id.*).

Approximately one week later, Encarnacion engaged in another flurry of Goris-focused activity. On October 1, 2012, he used the Marmol Account to post a picture of Goris and Goris's wife, and then used the Mendez Account one minute later to leave a comment on the photograph that stated: "What a surprise!!!! And there will be more surprises." (GXs 210, 211; *see also* A. 876). The next day, October 2, 2012, Encarnacion returned to Mrs. Goris's apartment (GXs 1509, 1603 (historical cell site data)) and left a handwritten Spanish-language letter that said:

> Goris Family,
>
> [Goris's] partner has already visited you to bring you the warning and we have not received a response. All that we want is that [Goris] return what he stole from us. That is all that interests us . . . I ask you, don't you dare try to move. If you do, there will be someone in your vicinity aware of any movement, and the most vulnerable will be your relatives in Las Piedras or Maribel's family in Rincon de Piedras and the ones in Santiago who have all been located from addresses to even telephone numbers. This very week we will give you some proof, so you can see how serious we are and that we are [unfinished sentence] Avoid tragedies. All we want is for [Goris] to return what he took, for him to contact his partner, he knows who, to his number or to the one he left his mother during the visit last week. . . .

(A. 685). Once again expressly threatening that nobody should contact law enforcement, Encarnacion added, "Avoid the 'law', otherwise the family in D.R. will not be saved and, on top of that, [Goris] carries with him the evidence of his actions . . . . So don't do anything stupid." (A. 685).

### 4.   Goris's Consensually Recorded Calls to Encarnacion and Juan Peralta

After Encarnacion visited Mrs. Goris's apartment, the Goris family reported Encarnacion's threats to several law enforcement agencies. (Tr. 516, 520). At the direction of law enforcement, Goris thereafter participated in a series of consensually recorded calls.

In one of the recorded calls, on October 8, 2012, Goris informed Encarnacion that he had received "the note that [Encarnacion] left" with Goris's "mom," and, not denying it, Encarnacion responded, "Yeah." (A. 950). Encarnacion complained to Goris that he had "been through hell," and told Goris that he and Goris were both "together," "accomplices," and "responsible" for the cocaine proceeds that Goris had stolen. (A. 949-55).

Encarnacion subsequently directed an associate named Juan Peralta to call Goris. (Tr. 870 (Encarnacion's testimony admitting that he asked Peralta to call Goris)).[3] During two calls between Peralta and Goris on October 28 and October 31, 2012, Peralta purported to be a Dominican drug trafficker and threatened violence against Goris and his family if Goris did not pay Encarnacion the money that Goris had stolen. (A. 964-70).

---

[3] Peralta pleaded guilty to threats charges in the same case.  In July 2014, Judge Rakoff sentenced Peralta principally to 36 months' imprisonment. (Dkt. No. 114).

### D.  Encarnacion's Trial Testimony

Encarnacion testified in his defense at trial over the course of two days. As to the marijuana conspiracy, Encarnacion denied having offered to transport marijuana or money for the Herrera brothers or Rodriguez (Tr. 874-76), asserting that his many calls with Rodriguez were only for the purpose of "giving [Rodriguez] the runaround [until] Rodriguez realize[d] [Encarnacion] was not reliable for him." (Tr. 897-98). Encarnacion claimed that one example of him giving Rodriguez "the runaround" was his recorded phone call with Rodriguez on June 26, 2010, in which Encarnacion explained to Rodriguez that his failure to appear in California that day was because of a traffic accident in Utah involving five "casualties." (A. 1088-95). On the witness stand, Encarnacion claimed that his excuse to Rodriguez had been "made up" (Tr. 898), and that there was "no accident whatsoever" (Tr. 938-39). In a rebuttal case, the Government called a Utah sheriff's detective, who testified that he responded to an accident that involved five deaths on June 26, 2010 near Ogden, Utah. (Tr. 1096).

With respect to the cocaine conspiracy, Encarnacion denied loading packages of cocaine into the tractor of his FedEx truck in 2010. (*See*, *e.g.*, Tr. 823-24). He also denied transporting money in the truck. (Tr. 827, 840). With regard to the events of mid-December 2010, Encarnacion claimed that "Goris had stolen . . . $3,000 that w[as] in my duffel bag" in the truck. (Tr. 836). Encarnacion testified that the alleged $3,000 was proceeds from mattress deliveries that he made on the day before he and Goris were dispatched to drive to Columbus, Ohio. (Tr. 843).

### III.  The Verdict, Post-Trial Motions, and Sentencing

Trial began on December 1, 2014.  After both sides rested, based on a suggestion from

Judge Rakoff related to the jury instructions, the Government dropped Count Five. (Tr. 790). On December 11, 2014, the jury found Encarnacion guilty on all five of the remaining counts, and, as to Court Two, found that the conspiracy involved at least five kilograms of cocaine. (Tr. 1279-83). As to Count One, the jury found that the conspiracy involved at least 100 kilograms of marijuana, which was a lesser-included offense of Count One's charge that the conspiracy involved at least 1,000 kilograms of marijuana. (Tr. 1279).[4]

In a written opinion dated February 17, 2015, Judge Rakoff rejected Encarnacion's post-trial motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. *United States v. Encarnacion*, No. 13 Cr. 30 (JSR), 2015 WL 756702 (S.D.N.Y. Feb. 17, 2015). With respect to the marijuana conspiracy, the Court concluded that "the jury had more than an ample basis for drawing conclusions contrary to what Encarnacion now argues." *Id.* at 1. The Court also found that Encarnacion's challenge to the sufficiency of the evidence supporting his cocaine-trafficking conviction "borders on the frivolous." *Id.* at 2. Finally, with respect to the threats charges, Judge Rakoff reasoned that (i) "[t]he jury was entitled to, and did, reject" Encarnacion's argument that he did not send the Facebook messages, (ii) "the circumstantial proof that Encarnacion played a role in writing or delivering the letter was abundant," and (iii) "[t]he jury obviously rejected Encarnacion's story" that he "only visited Goris's mother to prove that he 'had nothing to do with' stealing the money." *Id.* at 2-3 & n.3.

---

[4] The jury found the highest amount available to it. The Government had elected not to seek a finding that the conspiracy involved 1,000 kilograms and more, as charged in the Indictment. (*See* A. 1245).

On April 3, 2015, Judge Rakoff sentenced Encarnacion principally to 180 months' imprisonment and five years' supervised release.

## IV.  Direct Appeal

In a Summary Order dated February 16, 2016, the Second Circuit rejected Encarnacion's claims on direct appeal that:  (1) the evidence was insufficient to sustain the jury's verdict; (2) his Facebook messages and the threatening letter that he delivered to Goris's mother were hearsay and inadequately authenticated; (3) demonstrative exhibits used by the Government at trial were inadmissible; and (4) additional evidentiary issues rendered the jury's verdict unsound. *See United States v. Encarnacion*, 639 F. App'x 710 (2d Cir. 2016).

Encarnacion did not seek Supreme Court review of the decision.  (*See* Pet. at 2).

## V.  Encarnacion's 2019 Application Pursuant to the First Step Act

On or about March 22, 2019, Encarnacion submitted a letter to Judge Rakoff inquiring whether he was eligible for relief pursuant to the First Step Act.  (Dkt. No. 192).  By Order dated April 16, 2019, Judge Rakoff construed Encarnacion's submission as a motion for resentencing and determined that Encarnacion "does not appear to be eligible."  (Dkt. No. 191).

## <u>LEGAL STANDARDS</u>

Section 2255 permits

> a convicted person held in federal custody to petition the sentencing court to vacate, set aside or correct a sentence. A properly filed motion under Section 2255 must allege that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court was without jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.

*Bedoya-Cano v. United States*, No. 07 Civ. 9276, *et ano.*, 2008 WL 4200167, at *7 (S.D.N.Y. May

29, 2008).  "[R]elief under Section 2255 is available 'only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *Id.* (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)).

## DISCUSSION

### I.  The Petition Is Untimely

The Court should deny the petition because Encarnacion submitted it long after Section 2255's one-year limitations period expired, he has not claimed actual innocence, and he is not entitled to equitable tolling.

### A.  Applicable Law

A petition for relief under Section 2255 "must generally file a motion within one year from the latest of four benchmark dates":

> (1) when the judgment of conviction becomes final; (2) when a government-created impediment to making such a motion is removed; (3) when the right asserted is initially recognized by the Supreme Court, if it has been made retroactively available to cases on collateral review; or (4) when the facts supporting the claim(s) could have been discovered through the exercise of due diligence.

*Palmer v. United States*, No. 11 Civ. 8187 (JSR), *et ano.*, 2011 WL 13277793, at *1 (S.D.N.Y. Nov. 21, 2011) (citing 28 U.S.C. § 2255(f)). "For the purposes of Section 2255, 'a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction,' which is 90 days after the Court of Appeals' determination." *Naranjo v. United States*, No. 16 Civ. 7386 (JSR) (SLC), 2019 WL 7568186, at *3 (S.D.N.Y. Dec. 16, 2019) (quoting *Clay v. United States*, 537 U.S. 522, 525 (2003)).

"[A] petitioner is entitled to equitable tolling of the one-year statute of limitations if he shows: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *United States v. Wright*, 945 F.3d 677, 684 (2d Cir. 2019) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)). "To equitably toll the one-year limitations period, a petitioner must show that extraordinary circumstances prevented him from filing his petition on time, and he must have acted with reasonable diligence throughout the period he seeks to toll." *Baldayaque v. United States*, 338 F.3d 145, 150 (2d Cir. 2003) (internal quotation marks omitted).

## B. Discussion

The Second Circuit resolved Encarnacion's appeal on February 16, 2016. Encarnacion acknowledges that he did not seek Supreme Court review (*see* Pet. at 2), and his conviction therefore became final on May 16, 2016, which is 90 days after the decision of the Court of Appeals. Thus, Encarnacion had until May 16, 2017 to seek relief pursuant to Section 2255. *See* 28 U.S.C. § 2255(f). He failed to do so. Accordingly, the petition is untimely.

Encarnacion concedes as much, explaining that "I'm late on this 2255 Motion because of my financial status." (Pet. at 12). Encarnacion's explanation is insufficient, however, to establish the diligence or the extraordinary-circumstances requirements for equitable tolling. "Generally, the many challenges associated with life in prison do not, on their own, establish grounds for equitable tolling." *United States v. Rudge*, No. 16 Cr. 311, 2019 WL 4867828, at *2 (S.D.N.Y. Sept. 18, 2019). Contrary to Encarnacion's suggestion, *pro se* status, prison transfers, limited access to prison libraries, and lack of funds are not bases for tolling. *E.g.*, *Yong Suk Howang v.*

*United States*, No. 17 Civ. 6254 (LTS) (BCM), *et ano.*, 2019 WL 1994264, at *9 (S.D.N.Y. Apr. 19, 2019) ("[T]he hardships inherent in 'attend[ing] to the situation that face[s] most persons who have been incarcerated for years, and hav[e] very few funds,' Pet. Resp. at 6, are . . . shared by 'most persons' who have recently been incarcerated, and cannot justify the 'rare remedy' of equitable tolling, which is reserved for 'unusual circumstances' and is not a cure-all for an entirely common state of affairs." (internal quotation marks omitted)); *id.* ("[L]imited access to legal advice or information do not ordinarily support a claim of equitable tolling."); *Carbone v. Cunningham*, No. 06 Civ. 5710 (JGK), 2007 WL 4205821, at *3 (S.D.N.Y. Nov. 28, 2007) ("[A] *pro se* petitioner's ignorance of the law has been held insufficient to create the extraordinary circumstances required for equitable tolling of AEDPA."); *Francis v. Miller*, 198 F. Supp. 2d 232, 235 (E.D.N.Y. 2002) ("[P]etitioner's further assertions—that he has limited education, is ignorant of the law and legal procedure, lacked funds to hire another attorney, had limited access to legal assistance that was available to prisoners, and was allowed limited use of the prison law library— also are not extraordinary circumstances that warrant equitable tolling for the extended period of delay in this case.").

Encarnacion's claim that he sought an appointment of counsel by letter dated February 29, 2016 is also insufficient to excuse his untimely petition. (Pet. at 12). Such an appointment would only have been appropriate "if the Court [found] that an evidentiary hearing is required to determine whether the challenged sentence should be vacated." *Bautista v. United States*, No. 02 Civ. 3358 (JSR) (KN), 2003 WL 131699, at *1 (S.D.N.Y. Jan. 14, 2003). Assuming, *arguendo*, that Encarnacion filed such a request with the Court (*see* Pet. at 14), the letter he attached to the

petition falls far short of demonstrating that a hearing is required to resolve the claim Encarnacion now brings. Encarnacion's failure to specify any particular complaints about the performance of his trial or appellate counsel in the purported February 2016 letter to the Court only underscores that equitable tolling is unwarranted. And, in any event, even the pendency of a meritorious application for an appointment of counsel in connection with Section 2255 proceedings does not toll the one-year limitations period. *See Sanchez-Butriago v. United States*, No. 00 Civ. 8820 (JFK), *et ano.*, 2003 WL 354977, at *3 (S.D.N.Y. Feb. 14, 2003) ("The limitations period is not tolled whenever a petitioner files any sort of motion. Were it tolled so easily, a petitioner could repeatedly file motions, ones with little to no chance of success, and effectively eviscerate AEDPA's statute of limitations."); *see also Csanadi v. United States*, No. 15 Civ. 1459, *et ano.*, 2016 WL 2588162, at *6 (D. Conn. May 4, 2016) (citing *Sanchez-Butriago* and *Nelson v. Quarterman*, 215 F. App'x 396, 398 (5th Cir. 2007)).

Finally, Encarnacion claims that after he waited an unspecified number of "months" for the Court to address his alleged request for an appointment of counsel, his sister identified an unnamed attorney, who, according to Encarnacion, declined to file a Section 2255 petition on his behalf "[a]fter approximately four months." (Pet. at 12). This explanation hardly accounts for the 15 months that Encarnacion had to file a petition following the Second Circuit's rejection of his direct appeal. It is also clear from Encarnacion's 2019 application pursuant to the First Step Act (Dkt. Nos. 191-92), and the February 2016 application for an appointment of counsel (to the extent credited), that Encarnacion knew how to make *pro se* submissions to the Court. Given that context, his explanation for the untimely filing of the petition is insufficient to warrant tolling.

## II.  The Petition Is Meritless

"As is often the case with habeas applications, the difficulty of the preliminary procedural issues is out of all proportion to the merits of the petition itself." *United States v. Flores*, No. 01 Cr. 782 (GEL), *et ano.*, 2007 WL 4326733, at *3 (S.D.N.Y. Dec. 4, 2007). To the extent the Court reaches the merits of the petition, it should be denied because Encarnacion has not established the required elements of the *Strickland* claim he presses.

### A.  Applicable Law

"Under 28 U.S.C. § 2255, a convict in federal custody may petition the court that sentenced him to vacate his sentence for ineffective assistance of counsel."  *Herrera v. United States*, No. 19 Civ. 10637, *et ano.*, 2019 WL 6498102, at *2 (S.D.N.Y. Dec. 2, 2019) (citing *Massaro v. United States*, 538 U.S. 500, 504-06 (2003)).   "When assessing a claim for ineffective assistance of counsel, '[j]udicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  *Id.* (quoting *Grant v. United States*, 725 F. App'x 76, 76 (2d Cir. 2018)). "To overcome this strong presumption, a petitioner must establish that: (1) his 'counsel's representation fell below an objective standard of reasonableness'; and (2) 'any deficiencies in counsel's performance must be prejudicial to the defense.'"  *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984)).  Only if both elements of the test are satisfied can a reviewing court conclude that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and it is the petitioner's burden to establish both elements.  *Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* analysis, the reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689).  The defendant's burden is to show "'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 687).  A defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate.  *United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986).

Under the second prong, a defendant must meet the "heavy burden" of showing "actual prejudice." *Strickland*, 466 U.S. at 692. To satisfy the prejudice prong, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 693-94; *see, e.g.*, *United States v. Levy*, 377 F.3d 259, 264 (2d Cir. 2004).  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693).  "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."  *Strickland*, 466 U.S. at 693.  "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 694).  Moreover, "an analysis focusing solely on mere outcome determination, without attention to whether the result of

the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Thus, "the prejudice component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* at 372.

"A court need not address both prongs of the *Strickland* test; if either fails, the entire claim fails." *Grant*, 725 F. App'x at 76. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697.

### B.  Discussion

Construing the petition liberally in light of Encarnacion's *pro se* status, he presents three *Strickland* claims: (1) that counsel was ineffective for failing to argue that the evidence of his intent to distribute cocaine and marijuana, as charged in Counts One and Two, was insufficient, (2) that counsel was ineffective for failing to argue that the Government's proof at trial resulted in a prejudicial variance, and (3) that counsel was ineffective for failing to argue at sentencing that he was entitled to leniency because, in his view, he acted as a "mule" and a "transporter" in connection with Counts One and Two. (Pet. at 12). None of these claims has merit.

*First*, the record refutes any claim by Encarnacion that his attorneys failed to challenge the sufficiency of the evidence with respect to his intent to distribute narcotics. Rather than arguing that Encarnacion was a drug courier lacking intent to distribute narcotics, Encarnacion himself chose a different strategic course at trial by testifying that he was actually and entirely innocent of the charges. Following the trial, the Court found that Encarnacion's "dubious testimony" was so

implausible that it supported an "adverse inference" with respect to his guilt on Count One. *Encarnacion*, 2015 WL 756702, at *1. At sentencing, the Court characterized Encarnacion's testimony as "untruthful," "perjurious," and "blatantly false." (Sent. Tr. 4, 10, 18 (attached as Ex. A)). Nevertheless, Encarnacion's decision to testify in this fashion limited the arguments his attorney could plausibly present to the jury, and his strategy serves as a serious and likely insurmountable obstacle to a *Strickland* claim based on his counsel's purported failure to argue that he was a "mule" or "transporter." (Pet. at 12).

In any event, following the trial, defense counsel argued that the evidence was insufficient as to Count One because the Government did not prove that Encarnacion "engaged in conduct that furthered the goals of *distributing marijuana*." (Dkt. No. 179 at 9 (emphasis added)). With respect to the cocaine-trafficking charge in Count Two, counsel argued that the charge required proof that the defendant participated in the offense "'knowingly or intentionally' *to 'distribute' or to 'possess with intent to . . . distribute . . . a controlled substance*,'" that "[t]o prove intent, the Government must show knowledge," and that the evidence was insufficient as to "all of the elements." (*Id.* at 9-10 (quoting 21 U.S.C. § 841), 15 (emphasis added)).

Even if Encarnacion is now dissatisfied with the manner in which counsel phrased these contentions, he cannot establish *Strickland* prejudice because the jury found, and Judge Rakoff agreed, that the Government adduced sufficient evidence of all of the elements necessary to find Encarnacion guilty beyond a reasonable doubt. *See Encarnacion*, 2015 WL 756702, *1-2. So too did the Court of Appeals, *Encarnacion*, 639 F. App'x at 714 ("Wiretapped telephone calls provided substantial evidence to support the jury's verdict that Encarnacion conspired to distribute and

possess with intent to distribute marijuana."); *see also id.* ("Rafael Goris's testimony supported Encarnacion's conviction on the cocaine conspiracy.").  *See Kergil v. United States*, No. 17 Civ. 4675 (CM), *et ano.*, 2019 WL 3940621, at *13 (S.D.N.Y. Aug. 1, 2019) (finding no *Strickland* prejudice where "the Second Circuit confirmed the sufficiency of the evidence as to all defendants and all counts on direct appeal").

 *Second*, Encarnacion's counsel did not violate *Strickland* by failing to argue that there was a variance between the allegations in the Indictment and the Government's proof at trial. (Pet. at 12). Such an argument surely would have failed, at minimum, because variances must be prejudicial in order to warrant relief. *See United States v. Mucciante*, 21 F.3d 1228, 1236 (2d Cir. 1994) ("A variance is immaterial—and hence not prejudicial—where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." (internal quotation marks omitted)); *see also United States v. Kaplan*, 490 F.3d 110, 130 (2d Cir. 2007) ("There is therefore no indication in the record that the evidence adduced at trial unfairly surprised Kaplan, exposed him to a risk of double jeopardy, or unfairly prejudiced him in any other way."). Here, the defense was well aware of the Government's theory of the case and the supporting evidence because there was an extensive *Fatico* hearing in connection with the aborted sentencing that preceded the defendant's decision to withdraw his guilty plea and proceed to trial. *See Encarnacion*, 2014 WL 3500557, at *1 (describing three-day, six-witness hearing). At the hearing, the Government offered testimony from, and the defense had a pretrial opportunity to cross-examine, critical trial witnesses

such as Goris, Edwin Herrera, and HSI Special Agent Jason Samuels (to whom the defendant confessed regarding the Count Two cocaine-trafficking conspiracy). The Government's trial evidence conformed to the proof at the hearing. Therefore, counsel was not ineffective for failing to challenge Encarnacion's conviction on the basis of a variance.

*Third*, Encarnacion's trial counsel's performance at sentencing greatly surpassed constitutional requirements. After the Court calculated an applicable Guidelines range of 262 to 327 months, defense counsel persuaded the Court that a 180-month sentence was appropriate under Section 3553(a). Counsel was able to do so despite the defendant's argument at sentencing, as at trial, that he was "innocent of the crimes charged." (Dkt. No. 184-2 at 2). Counsel did not adopt this strategy and instead pursued one similar to the one identified by Encarnacion in the petition. Specifically, counsel argued in a sentencing submission that Encarnacion was a "*Johnny come lately* in the marijuana conspiracy" and analogized the defendant to an "arrested courier, dealer or seller" who operated at a "very low level" and was "one of the least culpable defendants." (Dkt. No. 184 at 9, 15; *see also id.* at 19 (arguing that Encarnacion occupied a "low-level position"), 29 (asking the Court to consider Encarnacion's "offense conduct relative to others")). Counsel prevailed to some extent on this claim, with Judge Rakoff describing Encarnacion prior to imposing sentence as a "relatively modest participant in these conspiracies." (Sent. Tr. 16). Therefore, Encarnacion is incorrect that he was prejudiced by a *Strickland* violation that "requires resentencing to 'mule' status." (Pet. at 12).

## III.   No Certificate of Appealability Should Be Issued

Encarnacion has not "made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2); *Matthews v. United States*, 682 F.3d 180, 185 (2d Cir. 2012).

Accordingly, no certificate of appealability should issue.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the petition should

be denied and no certificate of appealability should issue.

Dated: New York, New York
       June 24, 2020

Respectfully Submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By:      ___/s/_____
         Emil J. Bove III
         Assistant United States Attorney

Cc:     Edgar Encarnacion-Lafontaine
        (Via Mail)